(C. D. 1062)

WASHINGTON STATE LIQUOR CONTROL BOARD *v.* UNITED STATES

United States Customs Court, Third Division

(Decided August 8, 1947)

*Lawrence, Tuttle & Harper* (*George R. Tuttle* and *Frank L. Lawrence* of counsel) for the plaintiff.

*Paul P. Rao,* Assistant Attorney General (*Daniel I. Auster,* special attorney), for the defendant.

Before CLINE, EKWALL, and JOHNSON, Judges; JOHNSON J., not participating

CLINE, Judge: This action arising at the port of Seattle involves the breakage, leakage, or damage of certain butts containing brandy while in transit from a foreign port and the consequent loss of 10 per centum or more of the total value of the contents as exported. The plaintiff claims that the collector erred in assessing duty upon butts numbered 41, 91, and 100 on the basis of the capacity of the butts, less 2½ per centum. It is alleged that duty should have been taken upon the basis of the gauge reported by the gauger at the port of Philadelphia before being loaded into car PRR 51144 for transshipment to Seattle, to wit, 40 gallons, 55 gallons, and 14 gallons, respectively.

The collector reported in his letter of transmittal that duty was assessed on the basis of capacity, less 2½ per centum, in accordance with section 15.9 (*h*) of the Customs Regulations of 1943, in that (1) the invoice quantity was not stated; (2) the capacity, less 2½ per centum, was greater than the contents ascertained by the gauger; and for the reason that "the affidavit was not filed within 15 days from the date of delivery as required by par. 813, Tariff Act of 1930."

It appears from the entry papers that the liquor was shipped from Jerez, Spain, to Olympia, Wash., being landed in the United States at the port of Philadelphia and from there transported by rail to Olympia. The shipment consisted of 100 butts, numbered 1 to 100, each containing, according to the invoice, 132 gallons of 100-proof Spanish brandy. The immediate transportation entry, marked in evidence as collective exhibit 1, indicates that the liquor was gauged at Philadelphia on June 7, 1944, the quantities noted above being found as to butts numbered 41, 91, and 100. Twenty-six of the butts, including those here in question, were transshipped via the Pennsylvania Railroad car 51144. However, on June 14, 1944, at Proviso, Ill., butt numbered 100 was patched, and the contents of butts numbered 91 and 41 were transferred to other barrels

because of the crushed condition thereof. The original butts of those numbers and 7 others, which were found to be empty and crushed, were held at Proviso. At pier 56, Inspector Kelley noted in his report, dated June 27, 1944, that 19 butts out of the 26 shipped from Philadelphia were received. Under the heading: "Date of Delivery to Importer, or Gen. Order" appears 6–30–44. The gauger's report discloses that butt numbered 41, substituted for the original butt at Proviso, had a capacity of 69.5 gallons and contained only 36.3 gallons; that the repacked butt numbered 91 had a capacity of 69.6 gallons and contained only 50 gallons; and that butt numbered 100 had a capacity of 128.5 gallons and contained only 11.9 gallons.

The consumption entry permit, marked in evidence as part of collective exhibit 2, is stamped for "Dock Examination" with a notation to "Withhold delivery of mdse. until countersigned by Examiner." E. L. Kelley, as acting examiner, certified that the articles covered by the permit had been examined or sampled on June 30, 1944, and E. L. Kelley, as inspector, reports to the collector on June 30, 1944, that:

The articles covered by this permit have been landed, released, or disposed of as directed, and are in apparent good order, except as noted below: see Exception Lists attached.

The record of the Arlington Dock Co., Inc., which includes the butts of brandy in question, was admitted in evidence as collective exhibit 5. It discloses that Inspector Kelley did not release the 19 butts until August 3, 1944. Attached thereto, and a part of the exhibit, is a letter addressed to the Arlington Dock Co. from H. E. Wager, customs agent, inquiring as to the notation appearing on the record reading: "Released by Customs 8/3/44," and requesting a formal letter explaining the circumstances under which such was recorded. According to a copy of a letter in reply thereto, a notation was made on the record by Customs Inspector Kelley on August 3, 1944, reading: "Released C. E. 1793 6–30–44, 19 butts brandy, 7 short"; that on the same day, August 3, the broker called the dock company concerning the release of the brandy and was informed that the release was made but it was dated June 30, 1944, instead of August 3, 1944. The inscription concerning which the customs agent inquired was placed on the record by C. A. Cooper, in charge of the dock, at the request of the broker.

The importer's affidavit, filed in accordance with section 15.9 Customs Regulations of 1943, noting that butts numbered 41, 91, and 100 were damaged and crushed and suffered loss of more than 10 per centum of their contents as shipped due to injury in transit, was received at the collector's office at 4:36 p. m., August 3, 1944.

The broker who entered the merchandise testified on behalf of the plaintiff that he paid the duty upon the entire shipment in May 1944 at the time the first two carloads were received at the Arlington Dock

Co. pier, as required by the collector, although the carload containing the butts of brandy in question did not arrive until June 23, 1944. He testified that when merchandise is entered for consumption and the estimated duties paid, the permit for delivery, the invoice, and other papers are sent to the inspector for his examination and gauging, and after he finishes with the consumption-entry permit, the inspector sends it back to the collector.

The witness further testified that the inspector's return on a consumption-entry permit covering liquors—

* * * is not made available to us for inspection, nor are the Customs gaugers' gauge lists made available for inspection or for securing certified copies thereof until we have either filed our affidavit of loss as to any packages which have suffered injury and loss more than ten per cent of their contents, or unless we make it clear to the Collector's office that we have no claim, or no affidavit to file for any damaged packages. (Record p. 13.)

The certified copies of the gauger's return for which application was made to the collector were not received, according to the witness, until August 11, although the affidavit of breakage was prepared and filed on August 3, 1944.

The witness testified that he had kept constantly in touch with Mr. Cooper of the Arlington Dock Co. to ascertain when the butts would be released; that on August 1 or 2 he telephoned Inspector Oakley advising him that no release of the brandy from the last car received had been made by the customs to the dock company, and he was told that it would be attended to by Inspector Kelley; that he was notified by the dock company that the merchandise had been released on August 3 but that the release was dated back to June 30; and that objection was then made to Inspector Oakley relative to the date, and thereafter Inspector Kelley was redirected back to the pier to change that record so it showed August 3, the actual date of the release.

The witness further testified that the release referred to consists of the customs inspector informing the dock companies by means of written instructions that permission is granted to deliver the goods; that at the port of Seattle, at some piers, it is the practice for the customs inspector, after following out instructions on the permit, to release the merchandise by indicating on the freight expense bills, or a book of record kept for that purpose in the freight office of the dock, that the shipment is released from customs custody and available for delivery; that, at others, the release is indicated on the dock's copy of the ship's manifest, while the practice at the rail depots has been for the customs inspector to initial a book on the receipt of the carrier's manifest for cargo arriving and then to indicate on that same record the day when it is released from their custody for delivery; that occasionally simply a verbal statement was given to a representative of a dock or railway company that the goods were released, and that release would be later confirmed by a notation on the records.

The assistant manager of the Arlington Dock Co., Mr. Cooper, testified for the plaintiff that the dock consisted of a waterfront terminal at pier 56, having rail facilities and storage space for merchandise in an "upstairs warehouse."

Relative to the release the witness further testified that the first advice he had that the merchandise was released for delivery to the importer was when Inspector Kelley came down to put the hereinbefore mentioned notation on his file (exhibit 5). He further testified:

Q. About when was that?—A. That was on August 3, 1944.

\* \* \* \* \* \* \*

Q. When did he make his first notation?—A. On August 3rd.

Q. What did he write at that time?—A. He showed, "Released—C. E. 1793, 6–30–44, 19 butts brandy, 7 short, E. L. Kelley, Inspector."

Q. Did he return and change the date or change any part of that which he had previously written?—A. He returned a day or two subsequent to August 3rd and changed the "6" to an "8" and the "30" to a "3", to read "8–3–1944." (Record p. 34.)

Assistant Collector of Customs Ballinger testified for the Government that he had never heard of any law, rule, or regulation authorizing any employees of the collector's office to indicate on the records of any steamship company, railroad company, or dock company the date when goods are released; that the only thing required is that the carrier be notified and whether that notification be oral, or by any particular method, is not specified. He testified further, however, that it had been the practice at the port of Seattle for the past 30 years to stamp on the dock's documents, either their waybill, their check sheets, or copy of the manifest, the release, giving the date, the number, and the initials of the man who makes the release; that different docks have different methods, but the date of release does appear on the carriers' records. In such manner the customs inspectors complied with the directions on customs entry permits in order to "release the remainder from customs custody to or upon the order of the carrier by which the articles were brought to this port." As to such practice, the witness testified that it was established years ago and he knew of no authority for it, but it is one that "has grown up, and it has been found to be advantageous."

The witness testified that in the ordinary course of business, when merchandise is entered for consumption and is to be delivered from the wharf, the consumption entry permit, after being signed by the deputy collector, is sent to the deputy collector in charge of the outside division, who, in turn, sends it to the inspector at the pier or dock, or place of delivery, for release. When the inspector is through with the permit he sends it back to the office for disposition.

The principal question involved in this action concerns the timeliness of the affidavit filed by the importer. If the liquor was officially released on June 30, 1944, the affidavit is not filed within the time

granted by the statute. If August 3, 1944 is to be accepted as the time of release to the importer, the affidavit is lawfully filed.

The plaintiff contends that the evidence establishes that the liquor was delivered to the carrier on August 3, 1944 for release to the importer and that constitutes the day when it was "actually delivered * * * by the carrier or on its order directly to the importer," in accordance with section 15.9 (a), Customs Regulations of 1943, and that the affidavit filed with the collector the same day is timely.

The Government contends that the merchandise was officially released on June 30, 1944, and consequently the affidavit filed August 3, 1944 was untimely; that any notations made upon the records of the Arlington Dock Co. were purely voluntary and without authority of law, and such practice cannot be construed as an intention to be the official act of release. It is alternatively contended that the affidavit was prematurely filed inasmuch as the date "August 3, 1944" was not placed upon the record until the 4th, 5th, or 6th of August, and the affidavit filed on the 3d would have been filed before notice was given of the release.

The Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, and pertinent to the issue herein, provides as follows:

PAR. 813. There shall be no constructive or other allowance for breakage, leakage, or damage on wines, liquors, cordials, or distilled spirits, except that when it shall appear to the collector of customs from the gauger's return, *verified by an affidavit by the importer to be filed within fifteen days after the delivery of the merchandise*, that a cask or package has been broken or otherwise injured in transit from a foreign port and as a result thereof a part of its contents, amounting to 10 per centum or more of the total value of the contents of the said cask or package in its condition as exported, has been lost, allowance therefor may be made in the liquidation of the duties. [Italics not quoted.]

The Customs Regulations of 1943 as to loss of liquors in transit provide in part as follows:

15.9 **Loss of wines and liquors in transit; definitions; outages.**— (a) *Delivery shall be construed to be effected at the time when merchandise is actually delivered* to the storekeeper in charge of a bonded warehouse or *by the carrier or on its order directly to the importer.* * * *

* . * . * * * * *

(d) When merchandise is forwarded under an immediate transportation entry after inspection at the port of arrival, the report of the discharging inspector at that port is the gauger's return within the meaning of paragraph 813 of the tariff act. The date of delivery of the shipment shall be ascertained at the port of destination in accordance with the first sentence of paragraph (a) of this section. * * *

* * * * * * *

(g) "Contents in condition as exported" is held to mean the invoiced quantities, provided specifications are given for each individual package; otherwise the "contents exported" shall be held to be the gross capacities reported by the gauger. [Italics not quoted.]

Section 484 of the Tariff Act of 1930 provides in respect to the release of merchandise, as follows:

SEC. 484. ENTRY OF MERCHANDISE.

\* \* \* \* \* \* \*

(j) RELEASE OF MERCHANDISE.—Merchandise shall be released from customs custody only to or upon the order of the carrier by whom the merchandise is brought to the port at which entry is made \* \* \*.

The evidence before us stands uncontradicted to the effect that three butts of brandy numbered 41, 91, and 100 were released from customs custody on August 3, 1944, to the Arlington Dock Co., and that upon the same day the importer's representative was informed of such release and an affidavit was filed by the importer certifying that said butts had been broken or otherwise injured in transit from a foreign port, resulting in the loss of a part of their contents amounting to 10 per centum or more of the total value thereof in the condition as exported.

The gauger's exact finding of wantage was not enumerated in the affidavit, presumably because of the refusal of the collector at the port of Seattle to make such information available to the importer unless it is made clear to the collector that the importer will make no attempt to secure the return of duties unlawfully exacted. In such circumstances, it would seem that the form of affidavit here submitted, verifying the gauger's return, is in substantial compliance with the law.

Paragraph 813, *supra*, does not provide that an affidavit should be filed within 15 days after the date a customs inspector may decide to enter upon the official permit, but within 15 days after delivery. Delivery, as defined by the regulations, is effected at the time merchandise is *actually delivered*, and, according to section 484, *supra*, it is released from customs custody only to or upon the order of the carrier. The merchandise in question was actually released to the Arlington Dock Co. on August 3, 1944. There is nothing in the law or regulations to indicate that "delivery" of consumption-entry goods involving alcoholic liquors becomes effective at any time other than the time of the release thereof from customs custody.

Inasmuch as in our view an actual release of consumption-entry liquors constitutes a "delivery," it is immaterial whether or not there was specific authority for entering the date of the release upon the carrier's record. For the reasons stated, we hold that the importer's affidavit verifying the breakage was timely.

In the case of *United States* v. *Somerset Importers, Ltd.*, 33 C. C. P. A. 138, C. A. D. 328, our appellate court held that the importer was entitled to an allowance in duties upon loss of liquors through breakage upon the quantity of liquor shown by the gauger's return to have been lost before delivery at the port of final destination, rather than at the time of crossing the customs border. Therefore, the importers

here are entitled to an allowance in duties upon the basis of the return of the gauger at the port of Seattle. Inasmuch, however, as the protest specifically sets out and limits the claim for allowance to the wantage shown by the gauger's return at the port of Philadelphia, and claims that duty should be levied upon the basis of the gauge of brandies reported landed at that port, judgment will be entered directing the collector to reliquidate the entry assessing duty upon the basis of the gauge reported by the customs gauger at the port of Philadelphia as to butts numbered 41, 91, and 100, and to make refund of all duties taken in excess thereof.